[No. 29430. Department Two. November 23, 1945.]

MOXEE COMPANY, *Appellant*, v. LLOYD L. HUGHES, INC., *et al., Respondents.*[1]

*Velikanje & Velikanje*, for appellant.

*Conklin & Delle*, for respondents.

BLAKE, J.—This is an action for conversion of seventeen bales of hops. Answering the complaint, defendants admitted they took possession of the hops on August 24, 1942. By way of affirmative defense, they alleged, however, that possession was taken pursuant to an agreement with plaintiff (through C. A. Marsh, its president and manager), whereby defendant Yakima Chief Ranches, Inc., was to put the hops through a process for the extraction of the lupulin, and the defendant Lloyd L. Hughes, Inc., was to buy the lupulin from plaintiff at $1.75 a pound.

[1]Reported in 163 P. (2d) 603.

After hearing the evidence, the court made findings in accord with the version of the transaction maintained by the defendants and entered judgment, dismissing the action for conversion. Plaintiff appeals.

■ The question presented is solely one of fact and must be resolved in favor of the judgment unless we may say that the evidence preponderates against the findings. The trial court filed a memorandum opinion, in which the evidence was exhaustively reviewed and meticulously analyzed.

We shall not attempt a detailed review of the evidence here. If we were to do so, we could do nothing more than adopt or paraphrase the trial court's memorandum opinion. To resolve the question presented to us, it will suffice to point out a bit of appellant's own testimony, which, standing alone, we think, precludes us from saying that the evidence preponderates against the findings.

In the vernacular of the trade, the seventeen bales consisted of "hot hops." They were a part of the 1940 crop raised by appellant in excess of the allotment fixed for that year by the hop control board, and they could not be legally sold without authorization by that board. The lupulin extracted from such hops was, however, subject to sale.

At the time in question, Lloyd L. Hughes dominated both of the respondent corporations. In the negotiations that led up to this controversy, the respondent corporations were represented by James Hughes. The appellant was represented by C. A. Marsh.

Prior to August 24, 1942, Marsh admittedly had had one or more conversations with James Hughes concerning the seventeen bales of hops. Hughes testified that he had explained to Marsh the process for extracting lupulin; that the processing was done for and on behalf of the owner of the hops processed; and that the lupulin, when extracted, belonged to the owner. He explained the necessity for this as follows:

"Well, in the first place, the only reason we had to do it this way was because of the fact there was a Federal marketing agreement on hops and, in order to use those so-called hot hops, we had to make arrangements with the Hop Con-

trol Board, making out papers or contracts, or whatever you want to call it, so that it was permissible to use the raw materials, or hops, in making lupulin. So, from the standpoint of the marketing agreement, the title of hops could never be changed."

He further testified that, shortly before August 24th, he met Marsh on the street in Yakima and had the conversation with him upon which the court found that a contract had been entered into for the extraction and sale of the lupulin from the seventeen bales of hops in controversy. Hughes' version of the conversation is as follows:

"A. And, at that time, I started in talking to him about the '40 hops, to see if he had made up his mind as to what to do, and then I re-explained the deal to him, and he says, 'Well, I might just as well let you have them. You can go ahead and have them.' I said, 'Where are they?' He said, 'Out at Al Bateman's kiln.' . . . Q. Did you know, before that time, where the hops were? A. I did not, no. Q. All right. A. So I told him I would have them picked up and I would bring over papers it was necessary for him to sign for his protection and as far as the Hop Control Board was concerned. Q. Mr. Hughes, did you, in this conversation, say you would buy the hops, or just what? A. No. Q. Was the sum of $8.00 a bale mentioned? A. Well, only in this respect. That he asked about how much he would receive out of it. I told him, as a round figure, he might get $8.00 a bale out of it, plus his burlap, of course, back. Q. Plus his burlap back? A. Surely, because that comes back with his residue of hops.

"Q. Now, when do you think that conversation occurred? A. I think it was some time in the middle part of August. Q. 1942? A. 1942, yes. Q. Now, after that did you give directions to have the hops picked up? A. I did. Q. You didn't personally attend to it? A. I didn't personally attend to it at the time, no. I gave the conversation to Mr. Lang, and Mr. Lang, of course, in turn, relayed it down to the Ranch to have the hops picked up. Q. Now, you spoke, or you just testified, as I understood you, that you said to Mr. Marsh, that after he told you, you might take the hops, you would bring over the papers on it? A. That's right."

Marsh admitted that he had a conversation with Hughes at the time and place referred to by the latter, but denied he

had made any agreement for the extraction and sale of lupulin; and he denied that he had authorized Hughes to take possession of the hops. However, several days subsequent to August 24th, he had an offer from a hop buyer to purchase, at market price, his hot hops if and when the hop control board raised the ban on their sale. (The ban was actually removed in April, 1943, at which time the price of hops was forty-three cents a pound.) The buyer went to the Bateman warehouse to take samples of the hops, and learned that the hops had been taken away by the Yakima Chief Ranches, Inc., and so informed Marsh. Very shortly thereafter, Marsh visited the lupulin plant of the Yakima Ranches without first contacting James Hughes or anyone who had had anything to do with the transaction. Concerning this visit, he testified:

"Q. Did you go to the office down there? A. Yes. Q. You went to the office on this occasion? A. Yes, I went there first. I drove right up in front of the office. Q. Did you go in? A. I went to the door, boy in there said they weren't open for business. The door was locked, they come up and opened—it was fastened, anyway. Q. Do you know who that was? A. No, I don't recall. Q. You say a boy. Was it— A. A young fellow. Q. Well, say, sixteen, seventeen, along in there? A. Oh, he was older than that, I think; eighteen years old, twenty.

"Q. What did you ask of him? A. I just asked him if they were operating. He said, no, not then. Q. And, did you—What did you do then, Charlie? A. Well, I left my car standing there and walked over to the corner of the lupulin plant and there was a man sitting there, a guard. I sat down and talked to him a while. Wasn't anybody moving around and he was the only man I saw. Q. All right, now, what did you ask this watchman, as you call him? What did you say to him? A. Oh, I don't know; just ordinary foolish talk. I don't remember it. It didn't register, except that he asked me once— the way I come to go in there, he asked me in a conversation came up to the lupulin, asked me, ever been in the plant, and I told him, no, that I never had. Q. What was it you said about lupulin, Charlie? A. Who? Lupulin? Q. You and the watchman. I understood you to say something came up about lupulin. A. Lupulin plant. Q. Oh, lupulin plant? A. Yes.

"Q. And he asked you if you had ever been in one? A. Yes. I told him I'd never been in. Well, he said, I don't know why you shouldn't, nothing to do. He took me over, took me upstairs, introduced me to the man in charge, went upstairs inside the building, and then he went back down. This fellow was very nice about it. He showed me all through from the time they started until they were in the lupulin, and went over and showed me all the samples in the barrels, and some way there was one year didn't show up, 1940; we didn't see any 1940. Went clear back, and every barrel had a date on it, what it was. Said, how come no 1940? Said, haven't extracted any '40 hops; we have never taken the lupulin out of '40s. There wasn't any 1940 sample on the floor." . . .

"Q. Did you see any lupulin in cans? A. Oh, they looked like garbage cans and small barrels, this, that, and the other; I think, in some boxes; but they were all open, wide open, and the only distinguishing feature, as far as I was concerned, was the years. There was a year on every barrel, every box, every container, to show what year's lupulin it was. Q. The cans were also labeled the same way? A. Yes, they had a card stuck down into the— Q. (Interposing) Didn't they have the name of the man for whom the lupulin had been extracted on this card, also? Did you see a man's name there? A. Might have but they didn't register. I just looked to see the years.

"Q. Didn't you notice if your name was on any of that? A. No. I looked to see if there was any '40 lupulin there, when he told me what they were doing, he told me before we went over, too, what the barrels were. Naturally, when we went over, I looked to see if there was any '40. There wasn't any there. Q. Didn't you look to see if there was some with your name on it? A. I did, after that, no doubt; but that wasn't what I went up there for. Q. You only went there once? A. That's right. Q. On this same occasion, you did look to see if there was any lupulin with your name on it, or Moxee Hop Company? A. Oh, I·presume I did. Q. Yes. A. Naturally."

■ While the witness endeavored to minimize the implications inherent in this visit of his to the lupulin plant, we think it is manifest that it was made for the purpose of ascertaining whether his hops had been put through the lupulin process. This view of his testimony, of necessity, refutes his denial of the transaction as related by James Hughes.

We are satisfied that the hops were taken by Yakima Chief Ranches, Inc., with Marsh's knowledge and consent.

Appellant seeks to invoke the rule that there can be no binding contract when, although its terms have been agreed upon orally, the parties contemplate that it shall not be binding until evidenced by writing.

We are satisfied from the evidence that the only significance that Hughes and Marsh attached to the proposed written contract was to "keep the record straight" in so far as the regulations of the hop control board were concerned; in other words, their purpose was to have a written record showing that the transaction was *not* a sale of hot hops. Under the evidence, we think it is clear that neither Marsh nor Hughes contemplated that the binding effect of their oral agreement was dependent upon the execution of a written contract.

Judgment affirmed.

BEALS, C. J., ROBINSON, JEFFERS, and STEINERT, JJ., concur.